FILED

2011 Sep-28  PM 02:03
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| SAIIA CONSTRUCTION, LLC, | } | |
| | } | |
| Plaintiff, | } | |
| | } | CIVIL ACTION NO. |
| v. | } | 10-CV-01362-WMA |
| | } | |
| GREENWICH INSURANCE COMPANY, | } | |
| | } | |
| Defendant. | } | |

**MEMORANDUM OPINION**

Before the court is the motion of defendant, Greenwich Insurance Company("Greenwich"), for partial summary judgment as to claims brought by plaintiff, Saiia Construction, LLC("Saiia"). This action arises over a dispute regarding the scope of insurance coverage provided by a Professional and Pollution Liability Policy issued by Greenwich to Saiia. Saiia brings claims against Greenwich for breach of insurance contract and bad faith, and seeks a declaration that Greenwich must indemnify Saiia for certain future losses. For the reasons that follow, Greenwich's motion for partial summary judgment will be granted in part and denied in part.

**FACTS**[1]

By subcontract dated October 25, 2002, Saiia contracted with CED Construction Partners, Ltd. ("CED") to design and build a mechanically stabilized earth retaining wall ("Wall J") for the

---

[1] Because of the procedural posture, all facts are viewed in the light most favorable to Saiia.

Somerset Cove Apartments in Cartersville, Georgia ("the Project"). The owner of the Project is Somerset Cove Partners, Ltd., LP ("Somerset"). The subcontract price in favor of Saiia was $2,638,000.00. Pursuant to the subcontract, CED retained ten percent of the subcontract price, or $263,800.00. Saiia's subcontract with CED also provides that Saiia will remove all portions of its work that CED determines to be defective and correct any defective work at its own expense.

Mike Ryan ("Ryan") and Soil Reinforcement Design, Inc. ("SRDI") then subcontracted with Saiia to design Wall J. As part of their work, Ryan and SRDI were responsible for designating the specific type of soil to be used for reinforced and retained backfill in the construction of Wall J.

Terracon Consultants, Inc. ("Terracon") also subcontracted with Saiia to perform certain soil testing and geotechnical engineering services in connection with Wall J, including determining the propriety of the soil used as backfill for Wall J by testing the soil's grain size and compaction and analyzing the levels of "fines" contained within the soil.

Greenwich provided Saiia with a Professional and Pollution Liability Policy for coverage for costs and expenses related to Wall J, effective from May 1, 2004 to May 1, 2005 ("the Greenwich policy"). Among other things, the policy provides coverage for professional liability on a claims-made and reported basis. The

limits of liability under the policy are $1,000,000.00 per claim, and in the aggregate, subject to a self-insured retention of $25,000.00 per claim.

Additionally, American Zurich Insurance Company ("Zurich") provided Saiia with a commercial general liability policy for coverage for costs and expenses related to Wall J, effective from May 1, 2004 to May 1, 2005 ("the Zurich policy"). Travelers Casualty & Surety Company of America("Travelers") also provided Saiia with a commercial general liability policy ("the Travelers policy").

Saiia and its subcontractors completed Wall J on April 4, 2004. On October 22, 2004, CED advised Saiia that substantial ground movement was occurring around Wall J, alleged that the wall was failing, and advised that a forensic investigation would take place to determine the cause of the failure. On November 1, 2004, Saiia's insurance broker notified Greenwich of a possible claim arising out of CED's allegations that Wall J had failed due to Saiia's and its subcontractors' work. Saiia's November 1, 2004, claim submission included a Certificate of Liability Insurance which indicated that Zurich had provided Saiia with a commercial general liability policy, but it did not contain a copy of the Zurich policy. Greenwich provided Saiia with its Acknowledgment of Receipt of Notice of Loss on November 4, 2004. Then on February 15, 2005, Greenwich wrote Saiia setting forth its Reservation of

Rights.  The Reservation of Rights letter indicated that in light of an "other insurance" provision in the Greenwich policy and Greenwich's understanding that the matter had been submitted for coverage to Saiia's general liability carrier, Greenwich would respond only as an excess carrier to the extent coverage was available under the general liability policy.  At that time, Greenwich had not seen a copy of the Zurich policy.

On April 13, 2006, Saiia commenced an action against CED and Somerset in the Superior Court of Gwinnet County, Georgia, to recover the retainage amount under its subcontract with CED ("the underlying lawsuit").  In that action, CED and Somerset filed counterclaims against Saiia alleging that Wall J is defective and caused damage to a building constructed on the Project.  Saiia notified Greenwich that counterclaims had been asserted against it and described them.

During the course of the underlying lawsuit, Saiia retained Golder Associates, Inc. to conduct an investigation of the failure of Wall J.  On February 2, 2010, Golder Associates, Inc. submitted a report to Saiia ("the Golder Report") concluding that the failure of Wall J was primarily due to Terracon's failure to properly test the soils used as backfill for the wall.  The Golder Report also sets forth a detailed plan for the rehabilitation of Wall J, including tying back the wall with soil nails.

By e-mails dated October 9 and 13, 2009, Zurich notified

Greenwich of its position that due to a professional liability exclusion in its policy, at least some of the counterclaims asserted against Saiia in the underlying lawsuit were excluded under its general liability policy and were covered by the Greenwich policy, and thus requested Greenwich to participate in the defense and indemnification of the underlying lawsuit as Saiia's professional liability insurer. By email dated October 13, 2009, Greenwich responded to Zurich that its coverage was excess to that of Zurich and Travelers, and that until those policies are exhausted Greenwich's duty to defend is not triggered. Greenwich's email also states that it would reconsider its position if it were provided with actual policy information from Zurich and Travelers, but that although Greenwich had requested the actual policies from Zurich and Travelers since April 2008, only the Travelers policy had recently been provided to Greenwich, and the Zurich policy had still not been provided.

In March or April 2010, Saiia apparently notified Greenwich that any continued refusal to participate in its defense in the underlying lawsuit would constitute bad faith. In response, Greenwich retained counsel to investigate Saiia's claims and provide a coverage opinion. Counsel for Greenwich reviewed the Zurich and Travelers policies and determined that Greenwich's coverage was excess to that of Zurich and Travelers under the language of the policies. On April 8, 2010, Greenwich sent three

letters, one each to Saiia, Zurich, and Travelers, reiterating Greenwich's position that its coverage was excess to that of Zurich and Travelers.

Saiia, Somerset, CED, and Travelers settled the underlying lawsuit by agreement dated April 16, 2010 (the "Settlement Agreement"). The Settlement Agreement acknowledges that CED had withheld $262,884.43 in retainage from Saiia on the Project and asserted counterclaims in the underlying lawsuit against Saiia for repair costs, engineering services, attorney's fees, expert fees, and other expenses in the amount of $446,073.00. The Settlement Agreement requires Saiia and Travelers to relinquish any claim to the $262,884.43 retainage amount owed to Saiia under Saiia's subcontract with CED; requires Saiia to pay an additional $183,189.00 to CED representing backcharges against Saiia under its subcontract with CED in excess of the retainage amount; and requires Saiia to immediately undertake all work to correct and repair Wall J at its own expense, specifically according to the rehabilitation plan detailed in the Golder Report.

The same day the Settlement Agreement was signed, counsel for Greenwich wrote to counsel for Saiia offering to contribute $100,000.00 toward settlement of Saiia's claim and the underlying lawsuit. Later, Greenwich apparently advised Saiia that it was prepared to contribute $125,000.00 toward settlement. Both offers have been rejected by Saiia.

On April 23, 2010, Saiia filed its complaint in the present action against Greenwich.  The complaint contains a claim for breach of insurance contract which alleges that Greenwich has failed or refused to pay or reimburse the losses incurred by Saiia for the claims made pursuant to the Greenwich policy and seeks actual compensatory and consequential damages for such breaches; a claim for bad faith which alleges that in failing to defend and to pay the claims, Greenwich has breached its duty of good faith and fair dealing and seeks ; and a request for a declaration that Greenwich must indemnify Saiia for any future losses it should incur in repairing Wall J in accordance with the Settlement Agreement in the underlying lawsuit.

In response to one of Greenwich's interrogatories to Saiia in the present case which states: "Set forth every item of damages that you contend is covered by the Greenwich policy, including the exact dollar amount associated with the identified item of damage," Saiia stated: "See Exhibit A attached hereto.  In addition, per the Settlement Agreement, Saiia had to reimburse CED for expenses which it had incurred totaling $446,073.00.  Attached is a list of these expenses, as of 2/28/10, provided by CED.  Also, Saiia incurred attorneys' fees and expert fees in defending against the claims, but those are expected to be paid by Zurich and Travelers." Exhibit A attached to Saiia's responses consists of a series of itemized lists of the corrective work called for the in Settlement

Agreement, along with descriptions of work, with actual costs for such work totaling $1,462,187.19. The other attachment to Saiia's responses, which is a list of expenses provided by CED, totals $376,936.58, not the $446,073.00 set forth in Saiia's response. Thus, per the attached documentation, Saiia was claiming, as of the date it responded to Greenwich's discovery requests, $1,839,123.77 in damages.

In response to another of Greenwich's interrogatories to Saiia which states: "Set forth the monetary amount paid by any party other than Saiia to settle the litigation related to the subject incident," Saiia responded: "Saiia expects to be reimbursed $705,000.00 by Travelers and Zurich, plus the cost of defense."

## DISCUSSION

In the instant motion for partial summary judgment, Greenwich seeks a legal ruling that 1) the term PROFESSIONAL SERVICES in the Greenwich policy does not include the geotechnical engineering work performed by Terracon on behalf of Saiia; 2) certain costs and expenses incurred by Saiia to repair Wall J are not DAMAGES or LOSS as defined by the Greenwich policy; and 3) Greenwich did not act in bad faith as alleged by Saiia.

Greenwich's first and second arguments require the court to determine the legal significance of several of the terms of the

Greenwich policy under Alabama contract law.[2]   In Alabama, the
insured bears the burden of establishing coverage by demonstrating
that a claim falls within the insurance policy.  *Jordan v. Nat'l
Accident Ins. Underwriters, Inc.*, 922 F.2d 732, 735 (11th Cir.
1991) (citing *Colonial Life & Accident Ins. Co. v. Collins*, 194 So.
2d 532, 535 (Ala. 1967)).   But when an insurer denies coverage
based on an exclusionary clause, it bears the burden of proving the
applicability of that exclusion.  *Id.* (citing *Fleming v. Ala. Farm
Bureau Mut. Cas. Ins. Co.*, 310 So. 2d 200, 202 (Ala. 1975)).

    According to the Alabama Supreme Court,

> A contract of insurance, like other contracts,
> is governed by the general rules of contracts.
> Insurance companies are entitled to have their
> policy    contract    enforced    as    written.
> Insurance contracts, like other contracts, are
> construed  so  as  to  give  effect  to  the
> intention of the parties, and, to determine
> this intent, a court must examine more than an
> isolated sentence or term; it must read each
> phrase in the context of all other provisions.
>
> If   an   insurance   policy   is   clear   and
> unambiguous in its terms, then there is no
> question of interpretation or construction.
> The  fact  that  the  parties  interpret  the
> insurance policy differently does not make the
> insurance policy ambiguous. While ambiguities
> or uncertainties in an insurance policy should
> be resolved against the insurer, ambiguities
> are not to be inserted by strained or twisted
> reasoning.   Where  the  parties  disagree  on
> whether the language in an insurance contract
> is ambiguous, a court should construe language
> according  to  the  meaning  that  a  person  of

---

[2]The parties do not dispute that Alabama substantive law
applies in the present case.

ordinary intelligence would reasonably give it.

*Twin City Fire Ins. Co. v. Alfa Mut. Ins. Co.*, 817 So. 2d 687, 691-92 (Ala. 2001) (internal citations and quotation marks omitted).

The threshold question "whether a provision of an insurance policy is ambiguous is a question of law for the court." *Hutchinson v. Attorneys Ins. Mut. of Ala., Inc.*, 631 So. 2d 975, 976 (Ala. 1994). "'The terms of an insurance policy are ambiguous only if the policy's provisions are reasonably susceptible to two or more constructions or there is reasonable doubt or confusion as to their meaning.'" *Mega Life & Health Ins. Co. v. Pieniozek*, 516 F.3d 985, 992 (11th Cir. 2008) (quoting *State Farm Fire & Cas. Co. v. Slade*, 747 So. 2d 293, 308-09 (Ala. 1999)).

## THE DEFINITION OF "PROFESSIONAL SERVICES"

Greenwich first seeks a legal ruling that the geotechnical engineering work Terracon performed on behalf of Saiia does not constitute "professional services" as that term is defined in its policy. The insuring agreement of the policy requires Greenwich to "pay on behalf of the INSURED all LOSS in excess of the Retention amount . . . as a result of a CLAIM first made against the INSURED and reported to the Company, in writing, during the POLICY PERIOD . . . by reason of any act, error, or omission in PROFESSIONAL SERVICES rendered or that should have been rendered by the INSURED or by any person whose acts, errors or omissions the INSURED is legally responsible, and arising out of the conduct of the

10

INSURED's profession as stated in Item 5 of the Declarations."  The
policy defines "professional services" as "Construction management;
design performed by or on behalf of the Named Insured."

Greenwich contends that the geotechnical engineering services
provided by Terracon are neither construction management nor
design, and therefore, any of the costs and expenses Saiia seeks
reimbursement for related to Terracon's work are not covered under
the policy.[3]  In response, Saiia argues that Terracon's work, while
not constituting design, does constitute construction management,
a professional service under the policy.

Greenwich does not define either "design" or "construction
management" in its policy.  However, the fact that a word or phrase
in an insurance policy is undefined does not necessarily create an

---

[3]The parties do not dispute that Terracon's work was at
least part of the cause of the failure of Wall J.  Indeed, Saiia
alleges in its complaint in this action that the movement of Wall
J was caused by Terracon's failure to properly analyze the soil
and thereby allow soil with excess fines to be placed in the
reinforced zone behind Wall J.  Additionally, the Settlement
Agreement in the underlying lawsuit requires Saiia to perform
repairs to Wall J as specifically designated in the Golder
Report, and the Golder Report identifies  Terracon's failure to
properly test the soils as a cause of the failure of Wall J.
Accordingly, Greenwich's position is that to the extent Saiia
seeks reimbursement for costs and expenses arising out of any
negligent act, error or omission in Terracon's work, such work is
not covered as a professional service under the Greenwich policy.
However, Greenwich admits that to the extent any of the costs and
expenses Saiia seeks reimbursement for arise out of any negligent
act, error or omission in the design work of Ryan or SRDI on
behalf of Saiia, there is potential for coverage under the
policy.  In other words, Greenwich's argument with regard to the
definition of "professional services" is limited to the work
performed by Terracon only.

inherent ambiguity. *Twin City*, 817 So. 2d at 692. "To the contrary, where questions arise as to the meaning of an undefined word or phrase, the court should simply give the undefined word or phrase the same meaning that a person of ordinary intelligence would give it." *Id.* *See also Mega Life*, 516 F.3d at 991 ("This means that we should give the disputed term the meaning that 'a reasonably prudent person applying for insurance would have understood,' and the term's 'customary and normal meaning.'") (quoting *Slade*, 747 So. 2d at 308 and *Sullivan v. State Farm Mut. Auto. Ins. Co.*, 513 So. 2d 992, 994 (Ala. 1987)).

Since Greenwich did not define the term "construction management," the court first looks to its common dictionary definition in order to determine its customary meaning that a reasonably prudent person applying for insurance would understand. While the court is unable to find a definition for the phrase "construction management," The American Heritage Dictionary defines "construction" as "the act or process of constructing," and "construct" as "to form by assembling parts; build." THE AMERICAN HERITAGE DICTIONARY 315 (2nd College ed. 1982). The dictionary defines "management" as "the act, manner, or practice of managing, supervising, or controlling." *Id.* at 761. Additionally, Greenwich offers a definition of the term "construction management" that is found at www.wikipedia.com, an online encyclopedia, which states in part:

12

> The Construction Management Association of
> America (CMAA) (a primary US construction
> management certification and advocacy body)
> says the 120 most common responsibilities of a
> Construction Manager fall into the following 7
> categories: Project Management Planning, Cost
> Management, Time Management, Quality
> Management, Contract Administration, Safety
> Management, and CM Professional Practice which
> includes specific activities like defining the
> responsibilities and management structure of
> the project management team, organizing and
> leading by implementing project controls,
> defining roles and responsibilities and
> developing communication protocols, and
> identifying elements of project design and
> construction likely to give rise to disputes
> and claims.

http://en.wikipedia.org/wiki/Construction_management (last visited

September 23, 2011).[4]

Even though "[a]n undefined word or phrase in an insurance

policy does not create an inherent ambiguity," *Twin City*, 817 So.

2d at 692, the court nevertheless finds that the term "construction

management" is ambiguous by its terms.  The dictionary definitions

of "construction," "construct" and "management" suggest that

"construction management" is the practice of supervising the

assembling or building of some object or thing, which could entail

managing a variety of different projects or jobs.  Indeed, the

---

[4]The court notes that many courts have found Wikipedia to be
an unreliable source of information, as it is a free internet
encyclopedia that is collaboratively written by its readers and
can be edited by anyone.  *See* http://en.wikipedia.org/wiki/
Wikipeida:Introduction. However, the very fact that Wikipedia is
written and used by the general public may support its use in
this context, which is to determine how a person of ordinary
intelligence would define a particular term.

definition Greenwich offers indicates that a construction manager's
responsibilities encompass many areas, specifically including
"quality management," which could reasonably encompass Terracon's
work, which was to test the level of fines in the soils and to
ensure that those soils were proper for use in the construction of
Wall J.

Greenwich argues that it did not intend to provide coverage
for Terracon's geotechnical engineering work because it makes
coverage decisions based on what the insured indicates on its
application for insurance are the services that it provides, and
Saiia did not indicate that it engaged in either direct or
subcontracted "Geotech/Soil Engineering" services on its
application.[5] However, despite Greenwich's intentions, if it
wanted to preclude certain kinds of services from being considered
"construction management" under its policy, it should have defined
the word, but it did not do so. *See Blackburn v. Fid. & Deposit
Company of Maryland*, 667 So. 2d 661, 669 (Ala. 1995) ("Although an
insurance company is entitled to write a policy with narrow limits
of liability, to do so it must use precise language.").

Instead, there is "reasonable doubt or confusion" as to the

_____

[5] Saiia indicated on its application for the Greenwich
policy that it engaged in 67% "direct service" for "Excavation
Grading/Site Prep" and 33% "subcontracted" service for
"Excavation Grading/Site Prep." Although the policy provided a
space to indicate whether the applicant engaged in direct or
subcontracted "Geotech/Soil Engineering" service, Saiia did not
indicate any activity in that area.

meaning of "construction management," *Slade*, 747 So. 2d 308-09,

and it is unclear whether a reasonably prudent person applying for

insurance would have understood "construction management" to

encompass the geotechnical engineering services Terracon performed

on behalf of Saiia, or not.   The Alabama Supreme Court has

instructed:

> [I]f the court determines that the terms are
> ambiguous (susceptible to more than one
> reasonable meaning), then the court must use
> established rules of contract construction to
> resolve the ambiguity.   Under those
> established rules of contract construction,
> where there is a choice between a valid
> construction and an invalid construction the
> court has a duty to accept the construction
> that will uphold, rather than destroy, the
> contract and that will give effect and meaning
> to all of its terms. . . . [I]f all other
> rules of contract construction fail to resolve
> the ambiguity, then, under the rule of *contra
> proferentem*, any ambiguity must be construed
> against the drafter of the contract.

*Extermitech, Inc. v. Glasscock, Inc.*, 951 So. 2d 689, 694 (Ala.

2006) (quoting *Homes of Legend, Inc. v. McCollough*, 776 So. 2d 741,

746 (Ala. 2000).[6]  Applying these rules of contract construction,

---

[6]In other words, a determination that a contract is
ambiguous does not automatically mean that a jury is tasked with
deciding factual disputes to resolve the ambiguity; rather, the
court must attempt to resolve the ambiguity applying established
rules of contract construction.  *See id.* ("Some of this Court's
decisions indicate that, once the court determines that a
contract is ambiguous, it is for the finder of fact to resolve
the ambiguity.  However, . . . the court, as a matter of law,
should apply rules of construction and attempt to resolve any
ambiguity in the contract before looking to factual issues to
resolve the ambiguity."); *Vesta Fire Ins. Corp. v. Liberty Nat'l
Life Ins. Co.*, 893 So. 2d 395, 404 (Ala. Civ. App. 2003) ("[A]

the court finds that Saiia's interpretation of the term "construction management," i.e., one that would include Terracon's geotechnical engineering work within its purview, is the interpretation that is more likely to uphold, rather than destroy, the contract and give meaning and effect to its terms. Additionally, the rule of *contra proferentem* requires the court to construe "construction management" against its drafter, Greenwich, and in favor of Saiia. Accordingly, the court concludes that the term "construction management" in the Greenwich policy includes the geotechnical engineering services provided by Terracon on behalf of Saiia, and Greenwich's motion for summary judgment will be denied insofar as it pertains to its request for a ruling that Terracon's services do not constitute professional services under the Greenwich policy.

## THE DEFINITIONS OF "LOSS" AND "DAMAGES"

Second, Greenwich seeks a ruling that certain costs and expenses incurred by Saiia to repair Wall J under the Settlement Agreement are not "damages" or "loss" as those terms are defined in the Greenwich policy, which requires the court to examine the meaning of these words in the policy.

The policy requires Greenwich to "pay on behalf of the INSURED all LOSS . . .", "loss" being defined as "DAMAGES which the INSURED

---

court is to evaluate the contract on its face and apply rules of contract construction in an effort to resolve ambiguities before submitting the case to the jury.").

16

shall become legally obligated to pay as the result of a CLAIM." Greenwich's argument is that the expenses incurred by Saiia to repair Wall J pursuant to the Settlement Agreement do not qualify as loss under the policy because they are not amounts that Saiia was found to be "legally obligated to pay" to a third party, as there has been no adjudication by a court or alternative dispute resolution body.  Greenwich's position ignores the fact that Saiia incurred the expenses pursuant to the Settlement Agreement, which carries with it a legally-binding obligation to pay or perform. Greenwich's position is also belied by the language of its own policy, which defines damages as "a monetary judgment, award or **settlement** of compensatory damages." (emphasis added). Because the policy defines "loss" as "damages which the insured shall become legally obligated to pay", and specifically includes a "settlement of compensatory damages" in the definition of damages, Greenwich may not deny Saiia coverage for expenses incurred pursuant to the Settlement Agreement on the ground that they do not constitute "loss" under the policy.  Greenwich's motion for summary judgment will be denied insofar as it requests a ruling that certain costs and expenses incurred by Saiia to repair Wall J under the Settlement Agreement are not "loss" under the policy.

Turning now to Greenwich's second argument that expenses incurred to repair Wall J under the Settlement Agreement do not constitute "damages" under the policy, the policy defines "damages"

as follows:

> DAMAGES means a monetary judgment, award or settlement of compensatory damages. DAMAGES includes CLEANUP COSTS. DAMAGES does not include fines, taxes, penalties, or punitive (with the exception of Wrongful Death cases covered under Alabama Wrongful Death Statute Title 6, Chapter 11, Article 2.), exemplary, or multiplied damages, injunctive or equitable relief, **or the return of fees or charges for services rendered or expenses incurred by the INSURED for redesign, changes, additions, or remedies necessitated by a CLAIM.** However, DAMAGES does include fines, taxes, and penalties assessed against a third party for which the INSURED is legally liable. The time and expense incurred by the INSURED in assisting in resolving a CLAIM are not damages.

(Emphasis added). Greenwich reads the emphasized clause to exclude two separate categories from the definition of damages: 1) "the return of fees or charges for services rendered"; and 2)"expenses incurred by the INSURED for redesign, changes, additions, or remedies necessitated by a CLAIM". As such, Greenwich contends that Saiia is not entitled to recover from Greenwich the $262,884.43 retainage amount that CED withheld from Saiia and that Saiia relinquished all claims to in the Settlement Agreement because this amount represents a "return of fees or charges for services rendered" that is excluded under the definition of damages.[7] Additionally, Greenwich contends that Saiia is also not entitled to recover from Greenwich certain costs and expenses it

---

[7]As discussed *infra*, Saiia does not dispute Greenwich's position with regard to the retainage amount.

incurred in repairing Wall J pursuant to the Settlement Agreement because those monies are "expenses incurred by the INSURED for redesign, changes, additions, or remedies necessitated by a CLAIM" which are also excluded under the definition of damages.

Saiia, of course, urges a different construction of the policy's definition of damages, one that applies the word "return" not only to fees and charges for services rendered but also to expenses incurred by the insured for redesign, changes, additions, or remedies necessitated by a claim.  In other words, Saiia's position is that the policy **does** obligate Greenwich to reimburse Saiia for expenses it incurred in connection with repairing Wall J pursuant to the Settlement Agreement, and that **only** those "expenses incurred by the INSURED for redesign, changes, additions or remedies necessitated by a CLAIM" which are **returned** are excluded. In the alternative, Saiia asks the court to find that the damages exclusion is ambiguous, such to preclude summary judgment on this issue.[8]

At first blush, the use of the commas and the disjunctive "or" in the damages exclusion make it unclear whether "return" modifies only "fees and charges for services rendered" or also "expenses incurred by the INSURED . . .", which would suggest that the

---

[8]Saiia does not dispute that any return of fees or charges for services rendered are excluded under the damages definition, and as such, that Greenwich is not obligated to reimburse Saiia for the $262.884.43 retainage amount that it relinquished any claim to under the Settlement Agreement.

exclusion could be "reasonably susceptible to two or more constructions" and thus ambiguous. *Slade*, 747 So. 2d at 308-09. However, common sense dictates that if expenses are being incurred in the first instance by the insured, then they cannot be returned to any other party.  Indeed, monies can only be returned if they have first been advanced by another party.[9]  As such, the only reasonable interpretation of the damages definition is Greenwich's—that the word "return" applies only to "fees or charges for services rendered" and not to "expenses incurred by the INSURED for redesign, changes, additions or remedies necessitated by a CLAIM."  To adopt Saiia's contrary interpretation would be to create an ambiguity by "strained or twisted reasoning." *Twin City*, 817 So. 2d at 691.

Saiia contends that construing the damages exclusion as Greenwich suggests would result in illogical inconsistencies in application of the policy's coverage, pointing out that if Saiia hires a subcontractor to perform the repairs that are required by the Settlement Agreement, the policy would not cover those expenses because they are incurred by Saiia, but on the other hand, if CED or Somerset hires the same subcontractor to perform the repair work and then recovers those expenses from Saiia, then Saiia could

---

[9]This is why, under the definition of damages, the only amount that could be returned would be the original contract amount for the original services that were to be rendered for CED by the insured, Saiia, i.e., the $262,884.43 retainage amount. As such, that amount is not "damages" under the policy.

recover those monies it paid CED or Somerset as damages under the
policy because no exclusion would apply.  But Greenwich responds
that it is not inconsistent to provide coverage for amounts that an
insured must pay to a third party under a third party liability
insurance policy but not provide coverage for amounts that the
insured must incur itself in order to deliver the original work or
product promised under the contract.  Indeed, "[t]he time and
expense incurred by the INSURED in assisting in resolving a CLAIM"
is also explicitly excluded from the definition of damages in the
policy, further supporting Greenwich's construction of the damages
definition to exclude expenses incurred by the insured itself.

    An insurer has the right to write a policy with narrow
coverage, and have its policy enforced as written as long as it is
not ambiguous.  *Garrett v. Alfa Mut. Ins. Co.*, 584 So. 2d 1327,
1330 (Ala. 1991).  *See also Cotton States Ins. Co. v. Diamond Hous.*
*Mobile Homes*, 430 F. Supp. 503, 505 (N.D. Ala. 1977) ("insurance
companies have the right . . . to limit their liability and write
policies with narrow coverage; the insured has the option to
purchase the policy or look elsewhere").  The court concludes that
the damages definition is unambiguous insofar as the word "return"
applies only to "fees or charges for services rendered" and not to
"expenses incurred by the INSURED for redesign, changes, additions
or remedies necessitated by a CLAIM."  As such, Greenwich is not
obligated to reimburse Saiia for any expenses incurred by Saiia for

redesign, changes, additions or remedies to Wall J pursuant to the Settlement Agreement.  *See Alfa Life Ins. Corp. v. Johnson*, 822 So. 2d 400, 404-05 (Ala. 2001) ("If the trial court determines there is no ambiguity, it must determine the force and effect of the terms of the contract as a matter of law.").[10]   Therefore, Greenwich's motion for partial summary judgment will be granted insofar as Greenwich seeks a legal ruling that costs and expenses incurred by Saiia to repair Wall J are not "damages" under the Greenwich policy.

## BAD FAITH

Greenwich's final request is for a legal ruling that it did not act in bad faith as alleged by Saiia.  In Alabama, the elements of a bad faith claim in the insurance context are:

> (a) an insurance contract between the parties and a breach thereof by the defendant;
>
> (b) an intentional refusal to pay the insured's claim;
>
> (c) the absence of any reasonably legitimate or arguable reason for that refusal (the

---

[10]As mentioned, Saiia has alleged actual damages totaling $1,462,187.19 representing costs and expenses incurred by Saiia to perform the corrective work called for the in the Settlement Agreement.  Greenwich has apparently dissected the itemized list of work performed and projected/actual costs incurred that was produced by Saiia and has determined that $1,291,126.50 of this amount is not covered as damages for the reasons set forth above, but admits that the remainder, $171,060.69, represents some kind of compensatory or consequential damages and thus **would** be included within the damages definition in the policy. Presumably, this is the reason Greenwich deems its motion for summary judgment "partial."

absence of a debatable reason);

(d) the insurer's actual knowledge of the absence of any legitimate or arguable reason;

(e) if intentional failure to determine the existence of a lawful basis is relied upon, the plaintiff must prove the insurer's intentional failure to determine whether there is a legitimate or arguable reason to refuse to pay the claim.

*National Sec. Fire & Cas. Co. v. Bowen*, 417 So. 2d 179, 183 (Ala. 1982). Consistent with these elements, the Alabama Supreme Court has established what is now known as the "directed verdict on the contract claim standard" in bad faith cases:

In the normal case in order for a plaintiff to make out a prima facie case of bad faith refusal to pay an insurance claim, the proof must show that the plaintiff is entitled to a directed verdict on the contract claim, and thus, entitled to recover on the contract claim as a matter of law. Ordinarily, if the evidence produced by either side creates a fact issue with regard to the validity of the claim and, thus, the legitimacy of the denial thereof, the tort claim must fail and should not be submitted to the jury.

*National Sav. Life Ins. Co. v. Dutton*, 419 So. 2d 1357, 1362 (Ala. 1982).

However, in *Thomas v. Principal Financial Group,* 566 So. 2d 735, 744 (Ala. 1990), the Alabama Supreme Court held that the "directed verdict on the contract claim" test is not applicable to decide every insurance bad faith case, and that even if an insured is not entitled to a directed verdict on the contract claim, the bad faith claim could be submitted to the jury if "the insurer

23

either intentionally or recklessly failed to properly investigate the claim or subject the results of the investigation to a cognitive evaluation and review." *Thomas* and other "unusual or extraordinary" cases came to be known as "abnormal" bad faith cases, while the "directed verdict on the contract claim" cases were called the "normal" bad faith cases. *Slade*, 747 So. 2d at 306. A plaintiff must establish that his or her claim is either the normal case or the abnormal case of bad faith. *Id.* In the "abnormal" cases, "bad faith can consist of: 1) intentional or reckless failure to investigate a claim, 2) intentional or reckless failure to properly subject a claim to a cognitive evaluation or review, 3) the manufacture of a debatable reason to deny a claim, or 4) reliance on an ambiguous portion of a policy as a lawful basis for denying a claim." *Singleton v. State Farm Fire & Cas. Co.*, 928 So. 2d 280, 283 (Ala. 2005) (citing *Slade*, 747 So. 2d at 306-07).

Saiia characterizes this case as an "abnormal" bad faith case by arguing that Greenwich acted in bad faith by: 1) constructively denying Saiia's claim since 2005 by taking the position that its coverage was excess to that of Zurich and Travelers despite not having seen those policies, and 2) relying on an ambiguous damages provision to deny coverage. Therefore, the fact that the court has not ruled that Saiia is entitled to recover on its contract claim as a matter of law is not necessarily fatal to Saiia's bad faith

claim.  The court will address each of Saiia's arguments in support of its bad faith claim in turn.

Greenwich was first notified of Saiia's claim in November 2004.  The Greenwich policy contains an "other insurance" clause which provides that the insurance shall be in excess of not only the self-insured retention of $25,000.00 per claim but also in excess to "any other valid and collectible insurance available to the INSURED whether such insurance is stated to be primary, pro rata, contributory, excess, contingent or otherwise, unless such other insurance is written only as a specific excess insurance over the Limits of Liability provided in this Policy."  Based on this "other insurance" clause, Greenwich began taking the position in February 2005 that its coverage was excess to that of Saiia's general commercial liability insurers Zurich and Travelers.  Greenwich admits that it had not seen the language of either the Zurich or Travelers policies when it began taking this position, but it contends that it was familiar with the kind of general commercial liability policies its insureds usually had.  In 2006, Saiia notified Greenwich that counterclaims had been asserted against it in the underlying lawsuit arising out of the construction of Wall J.  In October 2008, when Zurich requested that Greenwich aid in defending and indemnifying Saiia in the underlying lawsuit, Greenwich reiterated its "excess" position, acknowledging that it had yet to see the Zurich policy but stating

that it would reconsider its position if Zurich would provide it with a copy of its policy. Saiia first objected to Greenwich's excess insurance position in March or April 2010, which Greenwich's corporate representative has testified prompted Greenwich to engage counsel to review the Zurich policy—for the first time—and provide a coverage opinion. Based on a professional liability exclusion and exceptions thereto in the Zurich policy and the "other insurance" clause in the Greenwich policy, counsel for Greenwich concluded that the Zurich and Greenwich policies covered the same risks and Greenwich's coverage would be excess to that of Zurich.[11]

---

[11]Under Alabama law, "[t]he determination of which insurance coverage is primary and which, if any, is secondary is dependent upon the exact language of each policy." *Isler v. Federated Guar. Mut. Ins. Co.*, 567 So. 2d 1264, 1265 (Ala. 1990). An insurance policy's "other insurance" or "excess insurance" clause only applies to limit liability "when a person is insured under two or more policies covering the same risks." *Blackburn*, 667 So. 2d at 670-71. The Zurich policy expressly excludes coverage for "professional services by you or on your behalf," which is defined in part as "Providing or hiring independent professionals to provide engineering, architectural or surveying services in connection with construction work you perform." However, there is an exception to the professional services exclusion in the Zurich policy, i.e., "Professional services do not include services within construction means, methods, techniques, sequences and procedures employed by you in connection with your operations in your capacity as a construction contractor." In other words, there is coverage under the Zurich policy for professional services that consist of "construction means, methods, techniques, sequences and procedures employed by you in connection with your operations in your capacity as a construction contractor." As such, counsel for Greenwich opined that the Greenwich policy and the Zurich policy contain overlapping coverage, and thus the Greenwich policy's "other insurance" clause applied to make Greenwich's coverage excess to that of Zurich.

Greenwich restated its excess position in letters to Zurich, Travelers, and Saiia on April 8, 2010. However, Greenwich ultimately offered up to $125,000.00 to settle Saiia's claim and the underlying lawsuit in and around April 2010.

Saiia asserts that Greenwich's actions are akin to the insurer's actions in *Blackburn v. Fidelity & Deposit Co. of Maryland*, a case in which the Alabama Supreme Court reversed the trial court's grant of summary judgment in favor of the insurer on the insured's bad faith claim, finding evidence of bad faith on the part of the insurer in refusing to defend the insured against a lawsuit brought against him. 667 So. 2d 661, 673 (Ala. 1995). In *Blackburn*, the insured, a corporate officer, sought coverage for claims arising from his company's buy-out of the shares of a majority stockholder. *Id.* at 666-67. The insurer twice explicitly denied coverage to the insured via letter, stating that he did not qualify as an insured under the policy and that policy exclusions applied to bar coverage; filed three declaratory judgment actions against the insured seeking a declaration that it did not have to defend or indemnify the insured; indicated its intent to deny the insured's request for coverage in internal documents; and refused to engage in settlement negotiations initiated by the insured despite settling claims against other corporate officers. *Id.* One of the insurer's stated reasons for denying coverage was that its policy was an "excess" policy, providing coverage only after the

27

insured's other policies reached coverage limits.  *Id.* at 669. However, the insurer admitted that it never actually saw a copy of the policies it claimed were to provide the insured's primary coverage, although it claimed that it repeatedly asked for copies. *Id.*  The Alabama Supreme Court examined the language of the insurer's policy as well as the insured's other policies and held that there was a question of whether the insurer's policy only provided excess coverage to the insured.  *Id.* at 671.  As such, the court held that the insurer's failure to properly investigate the insured's claim for a defense and failure to subject the results of that investigation to a fair review for more than four years after it first received notice of the lawsuits against the insured, amounted to a constructive denial of its duty to defend, despite the insurer's testimony that it "had not actually denied [the] claim to provide [a] defense, but had only not afforded it to him." *Id.* at 673.

However, Greenwich's actions are not as egregious as the insured's in *Blackburn.*  Although Greenwich initially took its excess insurance position without having seen the Zurich and Travelers policies, it repeatedly requested copies of these policies and stated that it was willing to reconsider its position. Further, Saiia's corporate representative has admitted that Saiia advised Greenwich during this time that Zurich and Travelers were defending the underlying lawsuit.  Nor did Saiia provide Greenwich

with proof that Saiia had met the $25,000.000 self-insured
retention under the policy's "other insurance" during this time,
not offering this information until discovery in the instant case.
When Saiia first challenged Greenwich's excess position in March or
April 2010, and Greenwich obtained copies of Saiia's general
liability policies, Greenwich engaged counsel to investigate and
provide a coverage opinion and then wrote letters to Zurich,
Travelers and Saiia explaining its counsel's conclusions.  These
actions do not suggest that Greenwich intentionally or recklessly
failed to subject Saiia's claim to an investigation or review.[12]
Significantly, unlike the insurer in *Blackburn* who refused to
engage in settlement negotiations with its insured, it cannot be
said that Greenwich disclaimed coverage when it attempted to
participate in the settlement of the claim and the underlying

---

[12]Indeed, although Saiia contends that Greenwich
constructively denied it a defense since 2005, Saiia stated
during discovery in this matter that Zurich and Travelers are
expected to cover the total cost of its defense in the underlying
lawsuit, and that it is not seeking defense costs from Saiia.  If
Saiia is not seeking to recover defense costs, it is only seeking
indemnification from Greenwich for costs related to the
Settlement Agreement, and Saiia's duty to indemnify was not
triggered until April 16, 2010, the date of the Settlement
Agreement.  *Compare Tanner v. State Farm Fire & Cas. Co.*, 874 So.
2d 1058, 1063 (Ala. 2003) (an insurer's duty to defend is
broader than its duty to indemnify and the duty to defend is
triggered based on allegations in the complaint) *with Hartford
Cas. Ins. Co. v. Merchants & Farmers Bank*, 928 So. 2d 1006, 1013
(Ala. 2005) ("Whether there is a duty to indemnify under the
policy will depend on the facts adduced at [] trial.").  At that
point, Greenwich offered $100,000.00 to settle the matter.  The
fact that Saiia is not seeking defense costs makes this case
distinguishable from *Blackburn*.

lawsuit, offering up to $125,000.00 to settle the matter. Accordingly, the court concludes that Saiia has not met its burden of showing that Greenwich intentionally or recklessly failed to investigate Saiia's claim or subject it to a cognitive review.

As to Saiia's other argument in support of its bad faith claim, as the court has already determined that the damages definition is not ambiguous, Greenwich cannot have acted in bad faith by relying on an ambiguous provision of its policy.

For the foregoing reasons, Greenwich's motion for summary judgment will be granted insofar as it pertains to its request for a ruling that it did not act in bad faith as alleged.  It would have been wiser or less risky for Greenwich to offer to defend under a reservation of rights, but this failure does not amount to bad faith.  It does subject Greenwich to the effects upon it that flow from the Settlement Agreement.

## CONCLUSION

Insofar as Greenwich's motion requests a ruling that the term "professional services" in its policy does not include the work performed by Terracon on behalf of Saiia, and a ruling that the costs and expenses incurred by Saiia to repair Wall J under the Settlement Agreement are not "loss" as defined by the policy, it will be denied.  Insofar as the motion is based on Greenwich's request for a ruling that the costs and expenses incurred by Saiia to repair Wall J under the Settlement Agreement are not "damages"

as defined by the policy and for a ruling that Greenwich did not act in bad faith, the motion will be granted.

This brings the court to the necessity of determining the effect of its rulings.  The only reason the court can see as to why Greenwich would use the word "partial" in describing its motion for summary judgment is that it feels in some way that it owes something to Saiia which still remains to be determined.[13]  To the extent that Saiia can prove that Greenwich owes it compensatory damages under the policy, which are not expressly excluded under the damages definition in the policy, a jury is entitled to determine the amount of damages owed to Saiia by Greenwich.

A separate order effectuating this opinion will be entered.

DONE this 28th day of September, 2011.

WILLIAM M. ACKER, JR.
UNITED STATES DISTRICT JUDGE

---

[13]Indeed, Greenwich has admitted that $171,060.69 out of the $1,462,187.19 that Saiia is claiming as damages represents some kind of compensatory or consequential damages and thus **would** be included within the damages definition in the policy. Additionally, Greenwich has not argued that the $183,189.00 amount that Saiia had to pay CED under the Settlement Agreement representing backcharges is excluded under the damages definition, so, presumably, Saiia could recover that amount from Greenwich as damages.